UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GERALD SIMMONS,
     Petitioner,

vs.                                                  Case No.:  3:20cv5461/MCR/EMT

MARK INCH,
     Respondent.
_____/

## **REPORT AND RECOMMENDATION**

Petitioner Gerald Simmons (Simmons) filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 15).  Simmons filed a traverse (ECF No. 22).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that Simmons is not entitled to federal habeas relief on Grounds One through Six, but he is entitled to relief on Ground Seven.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 15).[1]   Simmons was charged in the Circuit Court in and for Walton County, Florida, Case No. 2013-CF-672, with one count of burglary of a structure armed with explosives or a dangerous weapon (Count 1) and one count of dealing in stolen property (Count 2) (ECF No. 15-1 at 104–05 (Amended Information)).   A jury trial was held on August 11 and 13, 2014, at the conclusion of which the jury found Simmons guilty as charged, with specific findings as to Count 1 that Simmons was armed or became armed with a firearm, and that the structure he entered was a dwelling (ECF No. 15-1 at 137 (verdict); ECF No. 15-2 and ECF No. 15-3 (transcript of jury trial)).   On September 16, 2014, the trial court adjudicated Simmons guilty and sentenced him to thirty years in prison with a ten-year mandatory minimum on Count 1, and a concurrent term of ten years in prison on Count 2, with presentence credit of 206 days  (ECF No. 15-1 at 162–70 (judgment and sentence); ECF No. 15-4 (transcript of sentencing)).   Simmons filed a motion to correct sentencing error, under Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (ECF No. 15-5 at 4–10 (Rule 3.800 motion)).   The trial court denied the motion (*id.* at 16–19).

---

[1] Citations to the state court record and the parties' pleadings refer to the document numbers and page numbers assigned by the court's electronic filing system.

Simmons appealed the judgment and sentence to the Florida First District Court of Appeal (First DCA), Case No. 1D14-4411 (ECF No. 15-6 (Simmons' initial brief); ECF No. 15-7 (State's answer brief); ECF No. 15-8 (Simmons' reply brief)). On August 16, 2016, the First DCA affirmed the conviction and sentence but struck a fine, surcharge, and public defender lien/fee and remanded to the trial court for further proceedings on those financial matters (ECF No. 15-9 at 4–6 (opinion)). *Simmons v. State*, 196 So. 3d 1287 (Fla. 1st DCA 2016). The mandate issued September 1, 2016 (ECF No. 15-9 at 3 (mandate)).

On July 7, 2017, Simmons filed a motion for post-conviction relief in the state circuit court, under Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 15-10 and ECF No. 15-11 (Rule 3.850 motion)). Simmons subsequently filed a second amended Rule 3.850 motion (ECF No. 15-13 (second amended motion)). On June 20, 2019, the circuit court held a limited evidentiary on one of Simmons' claims (*see* ECF No. 15-14 (order setting limited evidentiary hearing); ECF No. 15-15 at 16–29 (transcript of evidentiary hearing)). The circuit court denied the second amended Rule 3.850 motion in an order rendered on December 26, 2019 (ECF No. 15-15 at 2–14 (order)). Simmons did not appeal the decision (*see* ECF No. 1 at 4).

Simmons filed his federal habeas petition on May 14, 2020 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court.  *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state

proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

III.    SIMMONS' CLAIMS

 A.    **Grounds One Through Six**

Grounds One through Six of Simmons' § 2254 petition present claims of ineffective assistance of trial counsel (IATC) (*see* ECF No. 1 at 4–16).  In Simmons' § 2254 petition, he states he presented each IATC claim in his Rule 3.850 motion, but he admits he did not appeal the circuit court's decision denying the motion (*id.*).  Simmons concedes that Grounds One through Six were not exhausted, but he argues he is nonetheless entitled to federal review of the claims under *Martinez v. Ryan*, 566 U.S. 1 (2012) (*id.*).  Simmons asserts he was not represented by counsel in the Rule 3.850 proceedings and thus did not know he was required to appeal the circuit court's decision (*id.*).

The State asserts an exhaustion defense as to Grounds One through Six (*see* ECF No. 15 at 20–25, 28, 33, 36, 39, 41).  The State argues that exhaustion of an IATC claim in Florida requires that the claim not only be raised in a Rule 3.850 motion, but also that the denial of the claim be presented on appeal (*id.* at 20 (citing *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)).  The State contends Simmons did not appeal the circuit court's decision denying the second amended Rule 3.850 motion to the First DCA; therefore, the claims are procedurally barred from federal review (*id.* at 20–25, 28, 33, 36, 39, 41).  The State contends that Simmons' reliance upon *Martinez* is misplaced, because *Martinez* does not apply to a petitioner's failure to file an appeal from an initial-review collateral proceeding

(*id.* at 20–22).  The State further argues that Simmons' lack of legal knowledge does not constitute cause for the procedural default (*id.* at 22–24).

In Simmons' traverse, he agrees with the State's procedural default argument, including that he may not rely upon *Martinez* to excuse the procedural default (*see* ECF No. 22 at 1–2).  Simmons concedes that his procedural default of Grounds One through Six precludes federal review of the claims and requests that the court "dismiss" those claims (*id.* at 1).

In Florida, exhaustion of state remedies for purposes of federal habeas corpus relief usually requires not only a filing of motion for postconviction relief, but also an appeal from its denial.  *See Leonard*, 601 F.2d at 808.  The state court record confirms that Simmons did not appeal the circuit court's denial of his Rule 3.850 motion.  Further, the parties are correct that *Martinez* applies only where the petitioner's procedural default occurred in an *initial-review* collateral proceeding; it does not apply in an *appeal* from such a proceeding.  *See Martinez*, 566 U.S. at 16; *Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1260 (11th Cir. 2014).  Additionally, Simmons' lack of legal knowledge does not constitute cause for the procedural default.  *See McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir. 1992) (the petitioner's lack of legal knowledge was not an external impediment to his defense in state court and did not provide cause for procedural default.); *Harmon v.*

*Barton*, 894 F.2d 1268 (11th Cir. 1990) (ignorance of the law does not establish cause for procedural default).

Grounds One through Six are procedurally defaulted, and Simmons has not shown he is entitled to federal review of any of these claims through a recognized exception to the procedural bar. Therefore, Simmons is not entitled to federal habeas relief on Grounds One through Six.

**B.    Ground Seven: "Petitioner's Fifth and Sixth Amendment Rights to the United States Constitution were violated when the court imposed the 10-year minimum mandatory sentence on Count 1 where although Petitioner was convicted of armed burglary, no allegation or proof was adduced that Petitioner actually possessed the firearm."**

Simmons states his thirty-year sentence on Count 1 includes a ten-year mandatory minimum, pursuant to Florida Statutes § 775.087(2) (the 10-20-Life statute), which authorized the mandatory minimum when an offender actually possessed a firearm during an enumerated offense such as burglary (ECF No. 1 at 17). Simmons alleges when an offender could have been convicted as a *principal* to an enumerated offense (which he states he likely was, based on the evidence adduced at his trial), the statutory (10-20-Life) provision requires proof that he *actually* possessed a firearm during the offense (*see id.*). Simmons asserts that if a jury does not specifically find that the defendant actually or personally possessed a firearm

during the commission of a burglary, the mandatory minimum may not be imposed (*id.*).

Simmons challenges the trial court's imposition of the ten-year mandatory minimum on grounds of lack of notice given, lack of a jury finding of actual possession of a firearm, and insufficiency of the evidence to support a finding of actual possession (ECF No. 1 at 17). More specifically, Simmons alleges the Amended Information did not charge that he actually or personally possessed a firearm, and instead alleged only that he "was armed or became armed within the structure" (*id.*). Simmons further alleges the Amended Information cited the armed burglary statute, Florida Statutes § 810.02(1)(b), (2)(b), but it did not cite the 10-20-Life statute, § 775.087(2) (*id.*). Simmons additionally asserts that the evidence at trial showed that Joshua Hicks committed the burglary; and Simmons' conviction was based solely upon an inference of guilt from the fact that *after* the burglary, he was in possession of property stolen during the burglary (*id.*). Simmons asserts the jury found him guilty as charged in the Amended Information, with an additional finding that he "was armed or became armed with a firearm," but the jury did not make a specific finding that he *actually possessed* a firearm (*id.*). Simmons asserts he presented this claim on direct appeal (*id.*).

The State concedes Simmons exhausted this claim in the state courts by presenting it on direct appeal (*see* ECF No. 15 at 43–44). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 44–48).

### 1.    Clearly Established Federal Law

In *Jones v. United States*, 526 U.S. 227 (1999), the Supreme Court, construing a federal statute, held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 526 U.S. at 243, n.6. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that the Fourteenth Amendment commands the same answer in cases involving a state statute. 530 U.S. at 476. And in *Alleyne v. United States*, 570 U.S. 99 (2013), the Supreme Court extended that holding to any fact that increases the mandatory minimum sentence for a crime. 570 U.S. at 133.

### 2.    Federal Review of State Court Decision

The Amended Information charged Simmons in Count 1 as follows:

**GERALD WAYNE SIMMONS, on or about May 24, 2013**, at and in Walton County, Florida, did unlawfully and without a licensed or

invited entry, enter a structure, **A HOME** with the intent to commit an offense within the structure, the structure being located at **3325 CORBIN GAINEY ROAD**, the property of **DEXTER BURKE** as owner or custodian of the structure, and in the course of committing the offense, **GERALD WAYNE SIMMONS** was or became armed within the structure with explosives or a dangerous weapon, A RUGER MINI 14 AND/OR A RUGER 22 AND/OR 20 GAUGE SHOTGUN, in violation of Sections 810.02(1)(b) and (2)(b), Florida Statutes.

(ECF No. 15-5 at 23).[3]   The Amended Information also charged Simmons with dealing in stolen property.

At Simmons' trial, Dexter Burke testified he lived at 3325 Corbin Gainey Road (ECF No. 15-2 at 120).   Mr. Burke testified that on May 23, 2013, the following items were stolen from his home:  Ruger Mini-14 rifle (.223 caliber), a 20 gauge shotgun, knives, coins, cash, a computer, and several items of jewelry, including a 1979 Walton High School class ring with his name on it (*id.* at 134–45, 152, 162–63).   Mr. Burke testified that three months after the burglary, he was at Lake Stanley, and Simmons (who Burke did not know at the time) pulled up in a car next to him (*id.* at 148, 156).   Burke testified Simmons told him that Josh Hicks broke into Burke's house (*id.* at 148).   Burke testified that Simmons was wearing his (Burke's) class ring, but denied that he broke into Burke's home (*id.* at 148–49).   Mr. Burke testified he grabbed Simmons' hand and took the class ring from him (*id.* at

---

[3] The initial Information charged Simmons with only one count, dealing in stolen property (*see* ECF No. 15-1 at 64).

149).  Burke testified that Simmons said he knew where some of Burke's other property was and could assist in getting the guns back (*id.* at 150–51).  After subsequently viewing a photo lineup, Mr. Burke identified Simmons as the man he spoke to at Lake Stanley (*id.* at 150–51).  Burke testified he told the sheriff's office what Simmons told him (*id.* at 159).  Mr. Burke testified he knew Joshua Hicks from years ago (*id.* at 157).  He testified that Hicks was a friend of his son's and had spent the night at the home once, three or four years ago (*id.*).

Katelyn Burke, Dexter Burke's daughter, testified she went to high school with Joshua Hicks (ECF No. 15-2 at 175).  She testified that Hicks was a friend of her brother's, but she never saw Hicks at their home (*id.* at 181).

Nathan Burgess testified that in May of 2013, he was a secondhand dealer (pawnbroker) and co-owner of Southeastern Gold Buyers (ECF No. 15-2 at 182–83).  Mr. Burgess testified that prior to purchasing anything from an individual, he obtained the person's thumbprint, signature, and qualifying form of identification, including a driver's license, military ID, or the like (*id.* at 184–88).  Mr. Burgess identified State's Exhibit 11-B as business records from Southeastern Gold Buyers dated May 24, 2013 (*id.* at 186–88, 194).  Mr. Burgess testified that on May 24, 2013 (the day after the Burke burglary), Gerald Wayne Simmons sold him items of jewelry, including a 1979 Walton High School class ring with the name "Burke" on

it (*id.* at 194–95).  The pawnbroker's transaction form, which was signed by Gerald Simmons and included his thumbprint, included a certification that the person signing the form was "the true and correct owner of the property" (*id.* at 195).  Mr. Burgess testified he gave Simmons $1,018.00 for the jewelry (*id.* at 195–96).  Mr. Burgess testified he entered the transactional information into the Leads Online database, which enables law enforcement to verify that items are not stolen (*id.* at 196–97).

Matthew Williams, an investigator with the Walton County Sheriff's Office (WCSO) testified he investigated the Burke burglary (ECF No. 15-2 at 219–21).  Williams testified that on August 23, 2013, he searched the name "Gerald Simmons" in the Leads Online database and discovered that Gerald Simmons pawned a 1979 class ring with the name "Burke" on it (*id.* at 222, 225–26).  Investigator Williams testified he also searched Leads Online for other names that Dexter Burke provided to the WCSO, but none of the names appeared in the database except Gerald Simmons (*id.* at 228–31).  Investigator Williams testified that Dexter Burke did not mention the name Josh Hicks (*id.* at 229).

Ryan McCormick, also from the WCSO, testified he booked Simmons into the jail and fingerprinted him when he was arrested on the instant charges (ECF No.

15-2 at 239–41). McCormick testified that the fingerprints were then transmitted to the Florida Department of Law Enforcement (FDLE) (*id.* at 241–42).

Jason Eversole testified he was a crime laboratory analyst with the FDLE, and certified as a latent fingerprint examiner (ECF No. 15-2 at 244–50). Eversole testified he compared the thumbprint from the pawnbroker's transaction form with the print on the "standard" (Simmons' booking card) and determined that they were from the same individual (*id.* at 250–61).

Joseph Paul testified he was an investigator with the WCSO (ECF No. 15-2 at 262). Paul testified that Simmons initiated contact with him on January 3, 2014 (*id.* at 263–64). Investigator Paul testified he recorded his interview with Simmons on that day (*id.* at 265).

The audio recording was published to the jury (ECF No. 15-2 at 265–82). During the interview, Simmons told investigators that Joshua Hicks told him that he (Hicks) and Charles Alford burglarized the Burkes' home (*id.* at 269, 271). Simmons admitted he obtained Dexter Burke's class ring around the time that Burke's home was burglarized (*id.* at 268–29). Simmons told investigators he introduced Joshua Hicks to Malcolm Gafford, who sold the stolen guns to a man named Lester (*id.* at 269–73). Simmons also told investigators he provided Hicks with a vehicle to take the guns to Malcolm Gafford, and "Malcolm called us when

it was time for Hicks to get his money" (*id*. at 271, 288).  Simmons told investigators he knew that two Rolex watches and a Michael Kors watch were stolen from the Burkes' home (*id*. at 274–75).  Simmons told investigators that Joshua Hicks left the Michael Kors watch on his (Simmons') doorstep as a "gift," and he wore it until he found out it was stolen (*id*. at 276–79).  Simmons told investigators he threw the watch into the woods (*id*. at 276–80).  Simmons also told investigators he could recover the Rolex watches (*id*. at 281).  He told investigators that Joshua Hicks sold the rest of the jewelry "under the table" in Alabama (*id*. at 281–82).  Simmons told investigators, "I need to get the deal Josh Hicks got [from the State Attorney's Office], and I'll never come back here again ever." (*id*. at 280).

Investigator Paul testified he located the Michael Kors watch exactly where Simmons said he disposed of it (ECF No. 15-2 at 282–84).  Investigator Paul testified that Joshua Hicks was also charged with the burglary of the Burkes' home (*id*. at 292–93).

Aaron Miller testified he was currently an inmate of the Florida Department of Corrections, but he was not incarcerated during the summer of 2013 (ECF No. 15-2 at 323–24).  Miller testified he knew Simmons, and he met Simmons at a convenience store in Defuniak Springs in June of 2013 (the month after the Burke burglary) (*id*. at 324–25, 330).  Miller testified that Simmons came to his house and

asked if he wanted to buy some items (*id.* at 326).  Miller testified Simmons had a

"pistol" and a "20 gauge shotgun," a silver Rolex watch, two Michael Kors watches,

and other jewelry (*id.* at 326–27).  Miller testified he asked Simmons where he got

the items, and Simmons responded that he "just hit a lick," which is slang for a

robbery (*id.* at 327–38).  Miller testified that Simmons said the "lick" came from

Corbin Gainey (*id.* at 328).  Miller testified he provided this information to the State

Attorney's Office and admitted he received a "benefit," from a different prosecutor,

of 48 months in prison, with a 3-year mandatory minimum (*id.* at 328–29).  Miller

admitted that his criminal charge carried a maximum possible penalty of 30 years in

prison (*id.* at 333).  Miller also admitted he had previously been convicted of

approximately six felonies and three or four misdemeanors involving dishonesty (*id.*

at 330–31).  Miller testified that he was being housed at the Walton County Jail

during Simmons' trial (*id.* at 332).  He testified that Simmons threatened him, and

he threatened Simmons in return (*id.* at 335–37).

The defense presented testimony from three inmates of the Walton County

Jail, Jonathan Brown, Jason Harvey, and Glenn Hunter.  Jonathan Brown testified

that the day before Simmons' trial, he overheard Aaron Miller tell Simmons that

another inmate paid him $30 to provide law enforcement with a statement against

Simmons  (ECF No. 15-3 at 29–30, 32).  Brown testified he also heard Miller tell guards that Simmons threatened him, which was a lie (*id.* at 31).

Jason Harvey testified he heard Aaron Miller tell Simmons that he (Miller) would have been sentenced to life in prison if he did not testify against Simmons (ECF No. 15-3 at 39–41).  Harvey admitted he had previously been convicted of three felonies (*id.* at 47–48).

Glen Hunter testified to the same facts as Jason Harvey (ECF No. 15-3 at 48–50).  Hunter testified he was currently charged with trafficking in methamphetamine (*id.* at 54).

Simmons testified on his own behalf (ECF No. 15-3 at 72–88).  He denied he committed the Burke burglary.  Simmons testified he went to the pawn shop with Joshua Hicks (*id.* at 83–85).  Simmons testified that Hicks sold the class ring at the pawnshop, but Simmons admitted he completed the paperwork because Hicks forgot his wallet (*id.*).  Simmons also testified he provided Joshua Hicks with a vehicle to retrieve guns stolen during the Burke burglary (*id.* at 81–82, 91–93).  Simmons admitted he had previously been convicted of four felonies (*id.* at 82).

The trial court instructed the jury as follows, in relevant part:

> Gerald Wayne Simmons, the defendant in this case has been accused of the crime of burglary of a structure armed with explosives or dangerous weapons and dealing in stolen property by trafficking.

Count One, burglary.  To prove the crime of burglary, the State must prove the following three elements beyond a reasonable doubt.

1.  Gerald Wayne Simmons entered a structure owned by or in the possession of Dexter Burke.

2.  At the time of entering the structure, Gerald Wayne Simmons had the intent to commit an offense in the structure.

3.  Gerald Wayne Simmons was not invited to enter the structure.

You may infer that Gerald Wayne Simmons had the intent to commit a crime inside a structure if the entering of the structure was done stealthily and without the consent of the owner or occupant.

Proof of intent.  The intent with which an act is done is an operation of the mind and, therefore, is not always capable of direct and positive proof.  It may be established by circumstantial evidence like any other fact in a case.

Even though an unlawful entering a structure is proved, if the evidence does not establish that it was done with the intent to commit an offense, the defendant must be found not guilty of burglary.

Proof of possession of stolen property.  Proof of possession by an accused of property recently stolen by means of a burglary, unless satisfactorily explained, may justify a conviction of burglary if the circumstances of the burglary and of the possession of the stolen property convince you beyond a reasonable doubt that the defendant committed the burglary.
. . . .
While armed.  If you find Gerald Wayne Simmons guilty of burglary, you must also determine if the State has proved beyond a reasonable doubt whether, in the course of committing the burglary, Gerald Wayne Simmons was armed or armed himself within the structure with a dangerous weapon.

> A dangerous weapon is any weapon that, taking into account the manner in which it is used, is likely to produce death or great bodily harm. It's not necessary for the State to prove that the defendant intended to use or was willing to use the weapon in furtherance of the burglary in order for a weapon to constitute a dangerous weapon.
>
> To arm oneself during the course of a burglary includes possessing a firearm, whether loaded with ammunition or not, at any time during the course of committing the burglary.
> . . . .
> Principals. If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if: [t]he defendant had a conscious intent that the criminal acts be done and, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit the crime.
>
> To be a principal, the defendant does not have to be present when the crime is committed.

(ECF No. 15-3 at 137–39).

The jury found Simmons guilty of burglary "as charged in the Information" (ECF No. 15-5 at 21). The jury additionally found that Simmons "was armed or became armed with a firearm," which elevated the burglary charge to a first degree felony punishable by life imprisonment, pursuant to the armed burglary statute cited in the Amended Information, Fla. Stat. § 810.02(2)(b) (*see* ECF No. 15-5 at 21, 23).

At sentencing, the prosecutor asked the court to impose a ten-year mandatory minimum (ECF No. 15-4 at 28). The prosecutor argued:

He's [Simmons] been accused of another crime, which he is not convicted for at this time, for breaking into a house and stealing a firearm.

But specifically with Dexter Burke, he pawned the items from that house the very next day.

You have this routine behavior that he has had the opportunity to get the help. Even while he's been incarcerated awaiting trial on these charges, he's continually getting new crimes. And it's always someone else's fault. However you look at it, and every time, Mr. Simmons is the one that's involved. Mr. Simmons is the one that's committing these crimes.

Based on that, we would ask that the Court sentence him—the first count, Your Honor, of burglary of a dwelling while armed with a dangerous weapon is a potential life offense, punishable by life offense. We would ask that the Court sentence him to 30 years with ten years being the minimum mandatory on that.

(ECF No. 15-4 at 28–29).

The court orally pronounced Simmons' sentence as follows:

Mr. Simmons, you've grown up in this courtroom and our other old courtroom. And I agree with what some of the folks said; that you didn't have the best childhood growing up. But time and time again you have been before this Court. In fact, it's one, two, three, over to the next page of prior record. And you've had chance and chance and chance again. And you have victimized the people of Walton County and today is the day that you reap what you sow. And so a life of crime, this is what it gets you.
. . . .
He'll be adjudicated guilty. Sentenced to 30 years in the Department of Corrections; ten of which will be a minimum mandatory sentence.

> Count two:  He'll be sentenced to ten years in the Department of
> Corrections.  That's not a minimum mandatory sentence.  It will run
> concurrent [sic].

(ECF No. 15-4 at 29–30).

The written judgment and sentence reflected Simmons' conviction of armed

burglary (ECF No. 15-1 at 162).  The judgment included a special provision that

imposed the 10-year mandatory minimum "Firearm/Weapon" provision of the 10-

20-Life statute, Florida Statutes § 775.087, on Count 1 (*id.* at 167).

In Simmons' motion to correct sentencing error, he argued that the court's

imposition of the ten-year mandatory minimum violated *Alleyne* (ECF No. 15-5 at

4–6).  The trial court adjudicated the claim as follows:

> [T]he defendant alleges that his sentence should be corrected to
> remove a minimum mandatory term for count I.  In particular, the
> defendant alleges that such minimum mandatory term should not be
> imposed because "the state did charge, the evidence does not support,
> and the jury did not find that Simmons possessed a firearm during a
> burglary in count I."  However, the defendant is not entitled to relief.
> The record reflects that the jury found the defendant guilty of
> "Burglary, as charged in the Information."  The Amended Information
> describes the "explosives or a dangerous weapon" as a Ruger mini 14
> and/or a Ruger 22 and/or 20 gauge shotgun."  The verdict form includes
> a specific finding that "The defendant was armed or became armed with
> a firearm."  Trial testimony also reflects that the defendant possessed a
> shotgun during the commission of the burglary specified in count I.[FN
> 9]  Considering such information, the instant claim is denied because a
> minimum mandatory term was imposed properly.

[FN 9:  See Trial Tr. vol I, 120–26, 238–46, Aug. 11, 2014
& Aug. 13, 2014; Trial Tr. vol II, 299–301, Aug. 1, 2014
& Aug. 13, 2014.]

(ECF No. 15-5 at 17) (some footnotes omitted).

Simmons presented the *Alleyne* issue as Issue VII of his initial brief on direct appeal (ECF No. 15-6 at 40–42).  The First DCA affirmed the conviction and sentence without providing reasons for its decision.  *See Simmons*, 196 So. 3d at 1287.

Where the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*  Looking through the First DCA's unexplained decision to the trial court's reasoned decision, the undersigned concludes that Simmons has satisfied § 2254(d).

The armed burglary statute under which Simmons was charged in the Amended Information provides, in relevant part:

(1). . . . (b) For offenses committed after July 1, 2001, "burglary" means:

1. Entering a dwelling, a structure, or a conveyance with the intent to commit an offense therein, . . . .

> (2) Burglary is a felony of the first degree, punishable by imprisonment
> for a term of years not exceeding life imprisonment . . . if, in the course
> of committing the offense, the offender:
> . . . .
> (b) Is or becomes armed within the dwelling, structure, or conveyance,
> with explosives or a dangerous weapon; . . . .

Fla. Stat. § 810.02(1)(b)–(2)(b).  A defendant may be convicted of armed burglary

as a principal *without actual possession* of a firearm because an armed burglary

conviction is not dependent upon proof of *actual* possession of a firearm.  *See Kenny

v. State*, 693 So. 2d 1136, 1136–37 (Fla. 1st DCA 1997) (recognizing that an

unarmed defendant could be charged and convicted of armed robbery under a

principal theory).

A criminal defendant in Florida, however, faces a mandatory minimum

sentence under the 10-20-Life statute only if the defendant *actually, personally*

possesses a firearm during the commission of an enumerated offense:

> (2)(a)1.  Any person who is convicted of a felony or an attempt to
> commit a felony, regardless of whether the use of a weapon is an
> element of the felony, and the conviction was for:
> . . . .
> d.  Burglary;
> . . . .
> and during the commission of the offense, such person *actually
> possessed* a "firearm" or "destructive device" as those terms are defined
> in s. 790.001, shall be sentenced to a minimum term of imprisonment
> of 10 years . . . .
> . . . .
> (4) For purposes of imposition of minimum mandatory sentencing
> provisions of this section, with respect to a firearm, the term

"possession" is defined as *carrying it on the person*. Possession may also be proven by demonstrating that the defendant had the firearm within immediate physical reach with ready access with the intent to use the firearm during the commission of the offense, if proven beyond a reasonable doubt.

Fla. Stat. § 775.087(2)(a)1.–(4) (emphases added); *see also Williams v. State*, 622 So. 2d 456, 465 (Fla. 1993) (explaining that the state must prove that a defendant has *actual physical* possession of the weapon to impose enhancement under either subsection (1) or (2) of section 775.087).

As previously discussed, the Amended Information alleged that in the course of committing the burglary, Simmons "was or became armed within the structure with . . . a Ruger Mini 14 and/or a Ruger 22 and/or 20 gauge shotgun, in violation of Sections 810.02(1)(b) and (2)(b), Florida Statutes." (ECF No. 15-5 at 23). This was the standard language of Florida's armed burglary statute, and the Amended Information cited only that statute. The Amended Information did not allege that Simmons *actually possessed* a firearm during commission of the burglary, nor did it cite the 10-20-Life enhancement (i.e., mandatory minimum) statute. The state court's determination that Amended Information put Simmons on notice of the 10-20-Life enhancement was an unreasonable application of *Alleyne*. *See State v. Rodriguez*, 602 So. 2d 1270 (Fla. 1992) (holding that in order to enhance a defendant's sentence by means of a statute containing a mandatory minimum, the

information must clearly charge the grounds for enhancement); *Arnett v. State*, 128 So. 3d 87, 87–88 (Fla. 1st DCA 2013) ("In order to enhance a defendant's sentence under section 775.087(2), the grounds for enhancement must be clearly charged in the information."); *Davis v. State*, 884 So. 2d 1058, 1060 (Fla. 2d DCA 2004) ("[T]he minimum terms mandated by the '10–20 –Life' Statute, section 775.087(2), cannot be legally imposed unless the statutory elements are precisely charged in the information.") (citations omitted); *Freudenberger v. State*, 940 So. 2d 551, 555 (Fla. 2d DCA 2006) ("The requirement in . . . *Davis* [884 So. 2d at 1060] . . . and similar decisions for precision in the allegations of fact necessary to support a penalty enhancement stems from the complexity of section 775.087 and the variety of sentencing outcomes possible under its multiple provisions").

The state court also unreasonably applied *Alleyne* in concluding that the jury found as fact that Simmons actually possessed a firearm during commission of the burglary. The verdict in Simmons' case, including the specific finding that Simmons "was armed or became armed with a firearm," clearly demonstrates that the jury found Simmons guilty of the elements of armed burglary, as set out in the Amended Information. But it is not clear whether the finding of guilt was based upon a *principal* theory. *See Stripling v. State*, 645 So. 2d 589 (Fla. 3d DCA 1994) (holding that the jury could find the defendant guilty of armed robbery based upon a principal

theory, even if the firearm was actually possessed by another participant during the commission of the crime).

Further, there was no jury finding that Simmons *actually* possessed a firearm during commission of the robbery, as is necessary to trigger imposition of the ten-year mandatory minimum sentence under section 775.087(2)(a). *See Williams*, 622 So. 2d at 465; *Knight v. State*, 70 So. 3d 674, 675 (Fla. 1st DCA 2011); *Freeny v. State*, 621 So. 2d 505, 506 (Fla. 5th DCA 1993) (holding that although possession of a firearm by a codefendant is sufficient to convict a defendant of armed robbery, pursuant to the principal theory, it is not a sufficient basis to warrant imposition of the 10–20–Life mandatory minimum sentence).

The jury instructions defined "armed" as including "possessing a firearm . . . at any time during the course of committing the burglary," but the instructions did not define possession, and the special interrogatory did not ask whether Simmons did or did not *actually* possess the firearm. *See Birch v. State*, 248 So. 3d 1213, 1216 (Fla. 1st DCA 2018) (a special interrogatory verdict asking whether the defendant did or did not actually possess a firearm during the commission of the offense is a mandatory prerequisite to a 10-20-Life sentence enhancement) (citing *Apprendi*); *see id.* at 1219 ("By definition, the 10–20–Life sentence enhancement applies only in cases of actual physical possession, not for constructive possession and not

through some other theory such as principal.") (citing *Kenny*, 693 So. 2d at 1136–37 (recognizing that an unarmed defendant could be charged and convicted of armed robbery under a principal theory, but holding that imposition of the minimum mandatory provision of § 775.087(2) required a "factual basis demonstrating actual possession of the firearm during commission of the offense")); *Henry v. State*, 834 So. 2d 406, 407 (Fla. 2d DCA 2003) (holding that an "as charged" verdict will not support the imposition of a minimum mandatory sentence under section 775.087(2) when the verdict fails to reflect that the defendant was in actual, as opposed to constructive, possession of a firearm); *see also Johnson v. State*, 855 So. 2d 218, 222 (Fla. 5th DCA 2003) (recognizing that possession may include constructive possession, imputed possession, or actual possession).

Moreover, no fairminded jurist could agree with the state court's factual finding that "[t]rial testimony [ ] reflects that the defendant possessed a shotgun during the commission of the burglary." The portions of the trial transcript cited by the state court do not include any testimony suggesting that Simmons *actually* possessed a shotgun during the commission of the burglary, as required to impose a sentence enhancement under the 10-20-Life statute.

The state court's first citation is to a portion of Dexter Burke's testimony (*see* ECF No. 15-2 at 134–40 (trial transcript pages 120–26)). However, during this

testimony, Burke never testified to facts from which a jury could reasonably infer that Simmons *personally* possessed a firearm during commission of the burglary.

The state court's second citation is to a portion of the recording of Investigator Paul's interview with Simmons (*see* ECF No. 15-2 at 265–73 (trial transcript pages 238–46)).  During that portion, Simmons denied that he broke into Dexter Burke's home.  Simmons admitted that he heard that Burke's house was burglarized, and he admitted that he obtained Burke's class ring "around the time" of the burglary.  Simmons told Investigator Paul that Josh Hicks admitted that he (Hicks) and Charles Alford broke into Dexter Burke's home.  Simmons also told Investigator Paul that Hicks said he was going to pick up some guns.  Simmons told Investigator Paul that he (Simmons) borrowed a car, he and Hicks went to Alaqua, Hicks dropped him off at Candace Morris' house, Hicks retrieved the stolen guns from wherever he stored them, and then Hicks took the guns to Malcolm Gafford to sell.  Simmons told Investigator Paul that Hicks showed him pictures of one of the guns, and Simmons admitted that he facilitated the meeting between Hicks and Gafford, but Simmons repeatedly denied that he was ever personally around the guns or ever personally saw them.  Simmons told Investigator Paul that he knew where the stolen watches were.

The state court's third and final citation to the trial transcript was to a portion of Aaron Miller's testimony (*see* ECF No. 15-2 at 326–28 (trial transcript pages 299–301)). Miller testified that Simmons came to his home and asked if he was interested in items he was selling. Miller testified that Simmons had a pistol, a 20 gauge shotgun, three watches, and some jewelry. Miller testified he asked Simmons where he got the items, and Simmons said he "just hit a lick" (slang for robbery), and that the lick came from Corbin Gainey Road.

Although the trial testimony certainly shows that Simmons burglarized the Burkes' home (either in person or as a principal), and that Simmons actually, personally possessed Dexter Burke's guns *after* the burglary, none of the trial testimony reasonably suggests that Simmons *actually, personally possessed any gun during commission of the burglary*. Therefore, the evidence was insufficient to support the 10-20-Life enhancement. *See Powell v. State*, 724 So. 2d 1207 (Fla. 2d DCA 1998) (minimum mandatory sentences for possession of firearm, under § 775.087(2), could not be imposed on defendant, who was convicted of armed robbery and armed burglary as principal in first degree, where evidence did not conclusively place gun in defendant's hand, or otherwise in his actual possession, during commission of crime); *Hough v. State*, 448 So. 2d 628 (Fla. 5th DCA 1984) (holding that there was sufficient evidence presented at trial to find defendant guilty

of armed robbery because, despite a dispute in the evidence as to which of the three

participants actually had possession of the single gun employed in the robbery, if

any one of them carried the firearm during the commission of the crime, all of them

are guilty as principals; however, in the absence of a jury finding that the defendant

actually possessed a gun, minimum mandatory sentence could not be imposed).

Simmons has demonstrated that the state court's rejection of his *Alleyne* claim

was an unreasonable application of *Alleyne*, and it was based upon an unreasonable

determination of the facts.  Because Simmons has satisfied § 2254(d), the court must

proceed to the next step of review under the AEDPA and conduct an independent,

*de novo* review of the merits of a Simmons' *Alleyne* claim.  *See Panetti*, 551 U.S. at

954.

 For the reasons discussed *supra*, Simmons has demonstrated that the fact

underlying the ten-year mandatory minimum enhancement, i.e., that he *actually*

possessed a firearm during commission of the burglary, was not charged in the

Amended Information, or found by a jury beyond a reasonable doubt.  Therefore,

the trial court's imposition of the ten-year mandatory minimum under the 10-20-Life

statute violated *Alleyne*.  *See Alleyne*, 570 U.S. at 103–04, 117 (reversing district

court's imposition of seven-year mandatory minimum sentence based upon finding

that Alleyne "brandished" a firearm, where jury found that Alleyne "used or carried

a firearm during and in relation to a crime of violence" but did not indicate that the firearm was "brandished").

The final step of federal habeas analysis is to determine whether Simmons has shown that the constitutional error (i.e., the *Alleyne* error) resulted in "actual prejudice." *See Brecht*, 507 U.S. at 637. Simmons has made that showing. The *Alleyne* error, alone, subjected Simmons to a ten-year mandatory minimum sentence that he otherwise would not have been subjected to. The appropriate remedy for the constitutional error is to require the State to remove the ten-year mandatory minimum from Simmons' sentence on Count 1.

## IV.    CONCLUSION

Grounds One through Six of Simmons' § 2254 petition are procedurally barred from federal habeas review. Therefore, habeas relief should be denied as to those claims. With respect to Ground Seven, Simmons has demonstrated that the state court's adjudication of the claim is *not* entitled to deference under § 2254(d). Simmons has also demonstrated that the ten-year mandatory minimum sentence, imposed pursuant to Florida's 10-20-Life statute, was imposed in violation of *Alleyne*, and that he suffered actual prejudice from the constitutional error. Therefore, Simmons is entitled to federal habeas relief on Ground Seven.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). Simmons cannot make that showing with respect to Grounds One through Six of the § 2254 petition. Therefore, the undersigned recommends that the district court deny a certificate of appealability as to those claims in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED IN PART AND GRANTED IN PART AS FOLLOWS**:

        a.    The petition be **DENIED** as to Grounds One through Six, and a certificate of appealability be **DENIED** as to those claims;

        b.    The petition be **GRANTED** as to Ground Seven, and the State be directed to remove the ten-year mandatory minimum from Simmons' sentence on Count 1.

2.    That the clerk of court be directed to enter judgment accordingly and close the case.

At Pensacola, Florida, this 24th day of February 2021.


        /s/ *Elizabeth M. Timothy*
        **ELIZABETH M. TIMOTHY**
        **CHIEF UNITED STATES MAGISTRATE JUDGE**

# <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.